INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, Plaintiff,

v.

DISTRICT 50, UNITED MINE WORKERS OF AMERICA, a/k/a International Union of District 50, United Mine Workers of America, et al., Defendants.

Civ. Nos. 748–68, 1238–68.

United States District Court
District of Columbia.

May 19, 1969.

Edward L. Carey, Willard P. Owens and Walter E. Gillcrist, Washington, D. C., for plaintiff.

Joseph C. Wells, Jack H. Weiner and Alfred D. Treherne, Washington, D. C., for defendants.

## OPINION

HOLTZOFF, District Judge.

This is a joint trial of two actions that were consolidated for that purpose. In each action the plaintiff is International Union, United Mine Workers of America. It is a nationwide labor organization of coal miners, subdivided into numerous local unions, organized along geographical lines in regions in which coal mining is carried on. The defendant in each action is District 50, an organization of persons employed in gas, coke and chemical industries, which for many years was allied with the plaintiff, and which is likewise subdivided into local units.

The first action is a simple suit on a promissory note, which originally was made for $8,440,000 in round figures. The balance claimed to be due on that note is $8,000,664.27. The second action is brought to enjoin the defendant from using the words "United Mine Workers of America" as part of its title, in view of the fact that the plaintiff has terminated the affiliation agreement between the two organizations. The affiliation agreement contained a provision giving either party the privilege of terminating it on 30 days' notice, which undeniably the plaintiff has given. Although on their face the two actions seem to be entirely separate and distinct, actually some of the issues in the two actions are intertwined and much of the evidence is applicable to both. Hence, it seemed in the interest of efficiency and of preventing a good deal of duplication that the two actions be consolidated for trial.

We shall take up first the action on the promissory note given by the defendant to the plaintiff on February 26, 1962, on which some payments have been made, leaving the balance due as has just been stated. Execution of the note and failure to pay the balance due are not denied. The defenses interposed are fraud, duress, lack of consideration and an understanding that the note was a paper transaction and that it was not intended that the note should be actually enforced and paid. The first three of these defenses completely collapsed at the trial. Not an iota or scintilla of evidence was introduced even remotely tending to show any fraud, deceit or misrepresentation, or any physical, moral or business duress or pressure.

What capped the climax as to these defenses was the testimony given on cross-examination by Angelo Cefalo, the Vice President of District 50, the defendant in these actions. He was one of the three executive officers who signed

the note on its behalf. He gave the following answers on cross-examination (page 423 of the transcript):

Q. At the time you executed the Articles of Affiliation, the financial agreement and the promissory note on February 26, 1962, did you do this voluntarily or were you coerced into affixing your signature?

A. I did it voluntarily.

Q. Were you fraudulently persuaded to sign any of these three agreements on that specific date?

A. No, sir.

Q. Were you subjected to duress, coercion or restraint at the time you affixed your signature on these three documents?

A. No, sir.

Q. At the time you signed the documents on February 26, you had occasion to read or have these documents read to you, is that correct?

A. I so testified.

■ As to the claim of lack of consideration, the evidence showed that the note was executed as the result of a compromise and settlement of a long standing obligation or indebtedness, that was reached as a result of negotiations. In order to understand the last contention, namely, that it was not intended that there was a real indebtedness between the parties or that the note was to be actually paid, it is necessary to review some of the antecedent events that led to its execution.

United Mine Workers, the plaintiff in these two actions, was created in 1890 and eventually became the dominant labor organization in the coal mining industry. In 1936 a large unorganized amorphous group of gas, coke and chemical workers desired to create a union and to become allied with the United Mine Workers. Their leaders informally approached the United Mine Workers and were welcomed. John L. Lewis, who was then the President of the United Mine Workers, apparently felt that it would strengthen the position of his organization in the labor world to have as an ally a group of workers in occupations that were on the fringe of the coal mining industry. He annexed the group to his cohorts. It was organized and chartered under the arbitrary name of "District 50, United Mine Workers of America." It had no experienced personnel at the beginning, it had but few facilities, and it possessed very little money. John L. Lewis appointed the officials of the new organization, lent personnel to it to conduct its operations and to expand its activities and caused the United Mine Workers to advance funds to it from time to time.

The sums advanced were very small at the beginning but increased in size as time went on, until on occasion they amounted to several hundred thousand dollars or more at a time. Each request for an advance was personally passed upon by John L. Lewis. These advances made it possible for the new organization to exist, to operate and to grow. The advances, however, were not intended as gifts but were deemed to be loans. In each instance Mr. Lewis in approving an advance expressly designated it as a loan and the defendant likewise denominated every advance as a loan. These advances were carried on the books of both organizations as loans and later were listed in the defendant's reports as loans when it filed official reports with the Department of Labor under recent amendments to the Labor Management Act. The plaintiff union imposed an obligation on the defendant to pay 50 cents per month per member as the price of the alliance and the privilege of using the plaintiff's name. The defendant's financial resources were insufficient to keep up these payments and to meet operating expenses as well. On many occasions the defendant borrowed funds from the plaintiff not only for operating expenses, but also for the purpose of paying the assessment it owed to the plaintiff. Thus we see an astounding and fantastic method of financing by

which the debtor borrowed money from his creditor in order to pay his debt to the creditor.

The plaintiff was very careful not to make the defendant an integral part of its organization. Thus, District 50 had no vote in the United Mine Workers and sent no delegates to its conventions. It was a vassal rather than a member of the plaintiff and was governed by the plaintiff in an autocratic method. It had no elections of its own and its members had no participation in its government and affairs. This situation continued from 1936 to 1961.

By 1961 the aggregate amount of advances from the United Mine Workers to District 50 reached the vast sum of about $23,000,000. On the other hand, the assessments paid by the defendant to the plaintiff totaled about $14,000,000. It will be remembered as heretofore stated that in large part these assessments were paid by the defendant to the plaintiff out of money that the defendant had borrowed from the plaintiff. Over the years the vassal had grown in membership, strength and prestige and possibly had become somewhat restive under the domination of the United Mine Workers. At about that time, too, a statute was enacted by the Congress known as the Landrum-Griffin Act, which introduced democracy into labor unions on a mandatory basis. It required all unions to conduct periodic elections of officers and further exacted from them the obligation to file formal annual reports of their finances with the Department of Labor.

The heavy monetary obligation of the defendant to the plaintiff troubled the defendant's officers. They entered into negotiations with the plaintiff's officers and were successful in obtaining a very favorable settlement. The plaintiff's officers agreed to give to the defendant credit on the note for the total amount of assessments that had been paid by the defendant to the plaintiff. By this compromise the debt of over $23,000,000 was reduced to a little over $8,000,000.

During the same period there were also negotiations concerning the exact status of the defendant and its precise relation to the plaintiff. An understanding was reached on all of these matters and was formulated in three documents executed on February 26, 1962, by the respective officers of both organizations. They were ratified by the defendant's Executive Board in April 1962.

The first document is known as Articles of Affiliation between International Union, United Mine Workers of America, and District 50, United Mine Workers of America. It provides in Paragraph II that each party recognizes the other as a separate, distinct and independent labor organization. In Paragraph III it was stated that these Articles of Affiliation constitute and evidence full settlement, satisfaction and release of any and all claims or demands of First Party upon or in, the properties and assets of Second Party and further constitute and evidence full settlement, satisfaction and release of all rights, claims, interests or demands of Second Party in and upon the assets and properties of First Party. In other words, the parties were exchanging general releases. It further provided in Paragraph IV that in consideration of the right to use the name "District 50, United Mine Workers of America", the defendant was to pay the sum of ten cents per member per month. Paragraph VI contained the following important provision:

> These Articles of Affiliation shall be effective as of March 1, 1962, subject to termination by either party by the giving of at least thirty days' written notice to the other party of such desired termination date, it being fully understood and agreed that all rights, privileges and obligations herein granted or created by this agreement (except the continuing obligation of Second Party to fully pay and liquidate any outstanding indebtedness due by it to First Party) shall cease and be of no further force and effect from and after said termination date.

The next document that was executed on February 26, 1962, is an agreement that has been called throughout the trial as a financial agreement between the two parties. It was stipulated that the total amount advanced and loaned by the International Union to District 50 equalled the aggregate sum of $23,-171,966.88, and that during the same period of time District 50 had paid to the International Union the total aggregate sum of $14,372,566.81. It was further agreed that there remained due from the defendant to the plaintiff the sum of $8,799,400.07. It was agreed that the last mentioned amount should be represented by a note to be given by the defendant to the plaintiff. The note was not to bear interest and was to be paid in monthly installments at the rate of forty cents per member per month.

The third document executed simultaneously with the first two was a promissory note running from the defendant to the plaintiff for the sum of $8,799,400.-07 payable as just stated and bearing no interest. The note contained a provision that if default be made in the payment of any monthly installment, the principal should at the election of the holder at once become due and payable.

When the documents were executed one of the defendant's officers expressed a doubt as to defendant's ability to make the payment of forty cents per member per month regularly. The President of the plaintiff union, Thomas Kennedy, replied that if any difficulty arose the defendant might request some relief. In fact, later the officers of the defendant union requested of the plaintiff a moratorium of several months. They continued payments on the note until sometime in 1964. They listed the note as an obligation in their annual reports to the Secretary of Labor. It is clear, therefore, that the defendant right along recognized the note as constituting a valid and binding obligation.

A statement made by Mr. Lewis after he had retired and had become President Emeritus was introduced in evidence in an effort to show that the indebtedness was a mere paper debt, not intended to be repaid. As heretofore indicated, Mr. Lewis contemporaneously treated each advance as a loan and expressly designated it as such. Were there any inconsistency between them, the contemporaneous statements made by him while he was active president should be preferred over a statement made years later after he had retired. Actually, however, it is far from clear that there is any inconsistency. The later statement is merely a recommendation that leniency be extended to the defendant and is not an unequivocal expression that the debt did not exist. In fact, the purport of the statement was advice to continue advances to the defendant. Mr. Lewis' successors, however, declined to follow that recommendation.

■ The conclusion is inescapable that the note constitutes a valid obligation of the defendant to the plaintiff. The two organizations with the growth of District 50 were rapidly coming to a parting of the ways. A cleavage, among other things, arose in the philosophy of the two groups. The defendant announced an espousal of nuclear energy. The plaintiff deemed this position as being inimical to the coal industry. Other differences arose, as well as some personality clashes. The defendant, starting as the protege of the plaintiff, was asserting its independence. On March 25, 1966 the defendant's Executive Board adopted a formal resolution repudiating the note. It had ceased making any payments two years previously.

As previously stated, the Court reaches the conclusion that the promissory note, which is the subject matter of one of the two actions is a binding obligation of the defendant to the plaintiff. Judgment will be entered in favor of the plaintiff against the defendant for the balance due on the note amounting to $8,000,664.27.

■ In its counterclaim the defendant seeks an accounting of assets belonging to it which it claims to have come

into the possession of the plaintiff. This counterclaim is not sustained by the evidence. There is no evidence that any assets belonging to the defendant came into the plaintiff's possession and consequently the counterclaim will be dismissed.

The second action is brought for an injunction against the use by District 50 of the words "United Mine Workers" in its title. It will be recalled that the affiliation agreement of February 26, 1962, contained a termination clause empowering either party to terminate the agreement upon 30 days' notice. On March 6, 1968, the plaintiff passed a resolution directing its officers to give written notice to the defendant of a termination of the affiliation agreement. This termination became effective April 6, 1968.

█ It is claimed by counsel for the defendant that the severance of this relation is invalid. Counsel seeks to invoke the principle that a union may not expel a component local unit except on charges and after a fair hearing. This principle no doubt exists, but it is not applicable to the instant case. The defendant is not a member or a component unit of the plaintiff union. The two unions are independent bodies. They are equals allied by an affiliation agreement. This relation is emphasized by the provisions of Paragraph II of the Articles of Affiliation to which reference has already been made. Paragraph II reads as follows:

"Each party hereto recognizes the other as a separate, distinct and independent labor organization, each international in scope, each party in behalf of its own separate membership operating under and in accordance with the terms and provisions of its own Constitution, functioning and conducting its affairs separately, individually and apart each from the other through its own respective officers and administrative subdivisions."

This agreement is signed by three officers of each of the two groups and in addition to that by the members of the Executive Board of District 50.

 The affiliation agreement contained a termination clause. The Court perceives no invalidity in that clause in view of the relation between the two groups. Plaintiff validly exercised its termination privilege. The alliance is at an end. The defendant may no longer use the name "United Mine Workers of America" and a permanent injunction against the defendant's use of these words in its title will be granted.

The transcript of this decision will constitute the findings of fact and conclusions of law.