559 F.Supp. 1337 (1983)
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, Plaintiff,
v.
N.A.A.C.P. LEGAL DEFENSE AND EDUCATIONAL FUND, INC., Defendant.
Civ. A. No. 82-1424.
United States District Court, District of Columbia.
March 28, 1983.
*1338 Edward W. Brooke, Barry J. Cutler, O'Connor & Hannan, Washington, D.C., Thomas I. Atkins, Gen. Counsel, NAACP, Brooklyn, N.Y., for plaintiff.
Jay Topkis, Kenneth Roth, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Vernon E. Jordan, Jr., Daniel Joseph, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., Barrington D. Parker, Jr., Charles S. Barquist, Parker, Ausprita, Neesemann & Delehanty P.C., New York City, for defendant.

DECISION AND ORDER
JACKSON, District Judge.
In the prosaic context of this trademark action two of the nation's preeminent civil rights organizations contend for the right to use the common distinguishing initials by which both are known and to which each can fairly claim to have added luster. Joined by purpose as well as name for most of this century, the National Association for the Advancement of Colored People ("NAACP") and the N.A.A.C.P. Legal Defense *1339 and Education Fund, Inc. ("LDF") are parting company. Over the years in which they labored together, however, they have taught four generations of Americans that civics and civility are cognate virtues as well as words, qualities no less in evidence now as they confront each other for the first time as adversaries.
NAACP alleges that it has used those initials as its mark since "at least 1910;" that beginning in 1939 it permitted the LDF, then a newly incorporated subsidiary, to use them; and that, the LDF being now independent, its continued use of them infringes the mark to the confusion of the public, and represents unfair competition, in violation of Sections 32 and 43 of the Trademark Act of 1946, 15 U.S.C., §§ 1114 and 1125. It prays that the LDF be permanently enjoined from the use henceforth of the initials "NAACP."
Acknowledging plaintiff's prior claim to the mark, the LDF answers that the NAACP irrevocably granted it the right to use the initials in perpetuity, unconditionally and without reverter, and that the NAACP's acquiescence in or indifference to its continued use of them for nearly 20 years since its first objection works an estoppel to object now. The LDF counterclaims for a judgment declaratory of its own absolute right to joint or concurrent use of the initials with plaintiff hereafter.
The case is now before the Court on the parties' cross-motions for summary judgment. They are agreed that the passage of time has rendered further illumination of the facts (upon which their differences are principally semantic) both unlikely and unnecessary. The documentary evidence now before the Court and parties' statements of the case establishes sufficient material facts, hereinafter set forth, to be undisputed, from which the Court concludes that judgment must be given for plaintiff.

I.
The plaintiff National Association for the Advancement of Colored People was founded in 1909 and incorporated in New York in 1911,
to promote equality of rights and eradicate caste or race prejudice among the citizens of the United States; to advance the interests of colored citizens; to secure for them impartial suffrage; and to increase their opportunities for securing justice in the courts, education for their children, employment according to their ability, and complete equality before the law.
And so it has done to this day, becoming a national organization grown to some 400,000 members who belong to about 1700 branches in 36 conferences located in seven regions throughout the United States.
The NAACP has traditionally sought to achieve its objectives by a calculated blend of education, lobbying, and litigation. In the early years litigation was undertaken largely ad hoc; legal services were generally donated by volunteers, and such expenses as there were paid from the NAACP's general funds or defrayed by contributions obtained for a particular cause. By the 1930's, however, certain of the NAACP's distinguished scholar-advocates foresaw the potential of litigation as the most effective vehicle for rapid progress and set in motion the programs culminating in the cases which constitute so much of the history of the civil rights movement of the 20th century. For such cases, however, they realized that the impromptu financing of the past would not suffice and sought a way to assure that cases would be adequately underwritten before being undertaken. The dilemma they encounterednow familiar to non-profit public interest groups but less so thenwas the reluctance of contributors to support organizations, however deserving, with non-deductible gifts and the unwillingness of the Internal Revenue Service (then the Bureau of Internal Revenue) to allow tax deductions for gifts to organizations engaged in political activity. The solution they arrived at was the LDF.
Thirty years after its own founding, the NAACP created the defendant "N.A.A.C.P. Legal Defense and Educational Fund, Inc.," as a New York non-profit corporation, with respect to which the NAACP Board of Directors *1340 resolved, on October 9, 1939, as follows:
WHEREAS, [the directors of the LDF] have requested permission of the [NAACP] to use the initials, "N.A.A.C. P.", in an application for a Certificate of Incorporation of the "N.A.A.C.P. Legal Defense and Educational Fund, Inc."; therefore,
BE IT RESOLVED, That the Board of Directors of the National Association for the Advancement of Colored People grant permission for the use of the initials, "N.A.A.C.P." by the "N.A.A.C.P. Legal Defense and Educational Fund, Inc.", and authorize the President and Secretary to execute whatever papers might be necessary to carry out this resolution.
In 1940 the LDF's certificate of incorporation was approved by the State of New York, and the Internal Revenue Service confirmed the new corporation's tax-exempt status. The creation of a separate organization to conduct the NAACP's legal work had enabled contributors wishing to support its non-political activities to receive tax deductions for their donations.
Thereafter the LDF and the NAACP (sometimes affectionately called the "Inc. Fund" and the "Association" to distinguish them in-house) kept separate books of account but still shared directors, offices and staff with one another. In the beginning there was considerable cooperation and coordination between the two organizations on matters of both operations and policy. Donations to one or the other were allocated according to their stated purpose without regard to the identity of the nominal payee, and the organizations frequently issued "exchange checks" to cure apparent mistakes in designation. The Executive Committee of the LDF Board of Directors often sought the approval of the board of the NAACP before it litigated questionable cases. And the LDF routinely handled general legal matters for the NAACP.
Although the organizations were physically separated in 1952 when the expansion of the LDF legal staff forced a move to new quarters a few blocks away, they experienced little distance of any other kind until May, 1957, when the LDF Board resolved to end the practice of interlocking directorates. The resolution did not result from any philosophical divergence but, rather, was adopted primarily as a countermeasure to "massive resistance" to their efforts to enforce compliance with Brown v. Board of Education (and secondarily to dispel growing IRS' unease at treating such close relatives as separate entities for tax purposes). State Attorneys General in several southern states were indiscriminately ordering the production of financial records and membership lists of both groups in quest of evidence of non-compliance with state lawany state lawto discredit or disable either or both. This technical separation for tactical purposes produced some confusion, primarily among those who had thought of them as, in essence, a single organization. But even after their formal separation the NAACP and the LDF remained largely able to coordinate efforts and avert conflicts, particularly in the sensitive area of fund-raising.
One of the NAACP's prominent leaders believed that a potential for disharmony had always existed in their structural differences. The NAACP is, and has always been, a membership corporation; the LDF has no members as such, its Board of Directors having only to account to itself. Whatever their origins, by 1960 tensions between the two had begun to emerge, and the first of several liaison committees was established to discuss jurisdictional issues and relations. In early 1962 the liaison committee presented a joint statement to the directors of both organizations suggesting means of and urging accommodation. Although tax considerations continued to preclude the NAACP's direct and formal control of the LDF, the directors of both boards were agreed that the whole of the LDF's resources could be devoted to NAACP legal programs without endangering the LDF's tax-exempt status.
Despite the sentiment for reconciliation, however, conflicts increased, primarily as to *1341 fund-raising, and in July, 1965, the NAACP Board passed a resolution calling upon the LDF to curb its autonomic impulses and revert to "special contribution fund status" or reincorporate under a name which would not include the initials "NAACP." As originally drawn the resolution provided that were the LDF to refuse to do either, the NAACP should sue "to enjoin them from use of the name NAACP," but in September 1965, at the urging of an elder statesman, the threatening language was stricken from the resolution as "impolitic."
In 1966 and 1967 the groups again attempted rapprochement, but relations now faltered over which was entitled to take major credit for the recent dramatic successes of the civil rights movement, and the NAACP was growing ever more concerned about its ability to compete for funds with its aggressive and tax-exempt cohort now concurrently approaching many of the same sources. The 1960's was, of course, a decade of momentous events in civil rights history: the March on Washington in 1963, followed by the assassination of President Kennedy, the enactment of the Civil Rights and Voting Rights Acts of 1964 and 1965 under President Johnson, racial riots across the country, and the well-publicized murders of prominent black figures. Both organizations, preoccupied with such events, were distracted from efforts to repair their alliance.
In the 1970's the persistent (but usually ameliorable) problem of contributors' confusion of the NAACP and the LDF[1] was exacerbated by controversy as to which organization was entitled to a principal share of the acclaim (and could exult the most) on the occasion of the 20th anniversary of the Brown decision. And as the dispute festered the NAACP leaders who had been present at the creation of the LDF, and had tempered relations between them for a quarter century, died, retired, or (in one case) accepted appointment to the Supreme Court.
Nevertheless the NAACP remained reluctant to provoke the final break with the LDF and endured the situation in silence (except for sporadic internal expressions of discontent in April, 1975, and again in January, 1978, when the NAACP Board again took up the LDF's use of the NAACP initials).
Then in December, 1978, the NAACP again notified the LDF of its concern about the confusion between the two groups "which results from the continued use of the NAACP initials in the Legal Defense and Educational Fund's name." Although the LDF immediately reiterated its willingness to discuss relations between the two, it still declined to change its name. Yet another liaison committee negotiated through early 1979, but in June the LDF once more refused either to resubordinate itself or to relinquish use of the initials. At the end of that month the 70th Annual Convention of the NAACP voted to call upon its Board to "withdraw and revoke permission previously granted" the LDF to use the initials. The Board did so on June 28th, voting to rescind the resolution of October 9, 1939, and revoke the permission therein granted. Formal notice of the Board's action was sent to the LDF within the week, demanding that it "cease and desist" in its use of the coveted initials. The LDF rejected the ultimatum, ironically, on October 9, 1979, the 40th anniversary of the fateful original authorization. For practical purposes the conciliatory process had ended, notwithstanding desultory efforts on the part of both to revive it, and on January 26, 1982, the NAACP signalled its disillusion by formally registering the initials with the Patent and Trademark Office. Its complaint herein was filed the following May 25th.

II.
Injunctive relief is appropriate in trademark cases when use of the distinguishing *1342 mark "is likely to cause confusion or ... mistake, or to deceive...." The parties need not be true competitors; the inquiry is, simply, whether the public "... is likely to believe that [the alleged infringer's] services come from the same source, or are affiliated with the trademark owner." Foxtrap, Inc. v. Foxtrap, Inc., 671 F.2d 636, 639 (D.C.Cir.1982). Nor is the right to enjoin an infringement limited to commercial enterprise. It is as available to public service organizations as to merchants and manufacturers, United States Jaycees v. Philadelphia Jaycees, 490 F.Supp. 688 (E.D. Pa.1980), vacated and remanded on other grounds, 639 F.2d 134 (3d Cir.1981); United States Jaycees v. San Francisco Junior Chamber of Commerce, 354 F.Supp. 61, 71 (N.D.Cal.1972), aff'd, 513 F.2d 1226 (9th Cir. 1975), but it may also be lost to them by the same defenses, including acquiescence and laches. Ancient Egyptian Arabic Order of Nobles of the Mystic Shrine v. Michaux, 279 U.S. 737, 49 S.Ct. 485, 73 L.Ed. 931 (1929); Creswill v. Grand Lodge Knights of Pythias of Ga., 225 U.S. 246, 32 S.Ct. 822, 56 L.Ed. 1074 (1912). One who uses another's mark and alleges laches or acquiescence amounting to estoppel assumes the burden of showing not only inexcusable delay but also the injustice of stopping him. Ralston Purina Co. v. Midwest Cordage Co., 373 F.2d 1015, 1018 (C.C.P.A.1967). And at the last injunctions remain always equitable remedies, to be issued when it would be equitable to do so although an award of money may be unjust. McLean v. Fleming, 96 U.S. 245, 253, 24 L.Ed. 828 (1877).
Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long and under such circumstances as to defeat the right itself.... Where consent by the owner to the use of his trademark by another is to be inferred from his knowledge and silence merely, `it lasts no longer than the silence from which it springs; it is, in reality, no more than a revocable license.' (citations omitted) Menendez v. Holt, 128 U.S. 514, 523-24, 9 S.Ct. 143, 144-145, 32 L.Ed. 526 (1888).

The Source of Authorization
The parties begin with alternative characterizations of plaintiff's "grant" to defendant of an interest of some description in the initials NAACP. Plaintiff, quoting its 1939 resolution, argues that the words "grant permission for the use of initials" conveyed to defendant no more than a revocable license based on a particular relationship, and when the relationship ended, plaintiff was entitled to rescind the license. The NAACP says that the relationship was one of parent and affiliate, and the general rule is that when an affiliate disengages itself from its parent, it relinquishes any right to use the parent's name, no matter the language by which the parental name was acquired, United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134 (3d Cir.1981); United States Jaycees v. San Francisco Junior Chamber of Commerce, 354 F.Supp. 61 Int'l Union U.M.W. v. District 50, U.M.W., 298 F.Supp. 1262 (D.D.C.1969), vacated in part as moot, 435 F.2d 421 (D.C.Cir.1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1372, 28 L.Ed.2d 645 (1971), even to show only that it was formerly affiliated with the parent organization. Grand Lodge Improved, Benevolent and Protective Order of Elks of the World v. Eureka Lodge No. 5, Indep. Elks, 114 F.2d 46 (4th Cir.), cert. denied, 311 U.S. 709, 61 S.Ct. 319, 85 L.Ed. 461 (1940).
Defendant says that the resolution bestowed upon it an unconditional property right in the initials in perpetuity. Citing Coca-Cola Bottling Co. v. Coca-Cola Co., 269 F. 796 (D.Del.1920), the LDF argues that the word "grant" has always connoted, in the absence of "words of limitation," the conveyance of an "absolute and unlimited right....," Id. at 810-11, making the 1939 resolution one of irrevocable assignment. The case on which defendant relies, however, arose in a commercial context and involved interpretation of the word "grant" as employed in the construction of a series of contracts. The court concluded that the documents and the parties' conduct considered as a whole indicated an intent to allow an indeterminable use of the trademark *1343 "Coca-Cola," and that, to give it any other meaning would inevitably result in the demise of the business the parties had sought to establish by contract in the first place.
Insofar as the case law is concerned, the relationship between plaintiff and defendant appears to be sui generis. It has characteristics of both the parent-affiliate and, as the LDF points out, even the parent-child relationship.[2] (And never, the LDF argues, borrowing from the idiom of family law, has any court gone so far as to deny even the most unruly offspring its birthright to the patronym). It least resembles, however, the commercial transactions in which the case law is most favorable to the LDF.
The Court concludes that it is unnecessary to assign the relationship to a category to determine the effect to be given to the 1939 resolution, however, for it is possible to discern, from both the language and circumstances of the resolution alone, an intent to confer upon the LDF less than a right to use the initials in perpetuity. First, the resolution is found in the minutes of a board of directors' meeting, a document whose primary function is to record the proceedings of the governing body of the organization and not to constitute the definitive expression of the action being authorized. Second, the resolution also authorizes the execution of "whatever papers" might be necessary to carry it out, clearly contemplating that further papers might be needed to give effect to an idea the resolution merely set in motion; thus, the use of the word "grant" cannot be presumed to have had the same precise meaning for the secretary who took the resolution down as it would for the draftsman of, for example, a conveyance of land. Third, the resolution grants permission  not the right  to use the initials, a usage which in common parlance implies something of lesser order of finality and which can ordinarily be withdrawn. Finally, and perhaps most importantly, those members of the NAACP's Board who undertook in October of 1939 to procreate the LDF saw themselves as engaged primarily in lawful tax avoidance. Had they envisioned the LDF in years hence as a potential competitor for contributions, not to mention acclaim, they would have been less generous with their symbol to which so much meaning had already been given.
The Court concludes that, irrespective of the characterization to be given the parties' relationship, the 1939 resolution was intended as a revocable license to use, and not an irrevocable assignment of, the disputed initials.

Acquiescence and Laches
Defendant LDF submits that the NAACP's inordinate delay in commencing this action, during which time the LDF has continued its use of the initials while consistently maintaining its right to do so, operates to estop plaintiff now. Estoppel, however, entails both a misleading affirmative showing on the part of the party to be estopped coupled with a detrimental change of position in reliance thereon by the one seeking to take advantage of the doctrine. And laches, that species of estoppel which specifically involves the elapse of time alone, requires prejudice as a predicate to its being successfully invoked. See 3 Callman, The Law of Unfair Competition, Trademarks and Monopolies, § 79.1 at 515 (3d Ed.1969).
This record simply does not support a finding that the NAACP, aside from forbearance, said or did anything to mislead the LDF as to its willingness to let the status quo remain undisturbed forever. Since 1965 the LDF has been intransigent to the NAACP's repeated, if intermittent, overtures to it to persuade it to drop the initials, and yet the NAACP never capitulated on the point. (Indeed, the LDF has, since the mid-1960's, anticipated the possibility that it might eventually have to disassociate itself altogether from plaintiff by including a disclaimer of any present relationship *1344 on its stationery). Given the ancestry of their relationship, the NAACP's inaction is less consistent with acquiescence freely accorded than with a reluctance to antagonize a onetime ally or to abort hopes of an eventual reconciliation by anything so divisive as a lawsuit.
While it occasionally bars an award of damages, laches is rarely found a sufficient bar to an injunction in trademark actions. See Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888); McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828 (1877); Indep. Nail & Packing Co. v. Stronghold Screw Products, Inc., 205 F.2d 921 (7th Cir.), cert. denied, 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391 (1953). Courts frequently tolerate long delays in bringing such suits, see e.g. Indep. Nail & Packing Co., 205 F.2d at 927; James Burrough, Ltd. v. Sign of Beefeater, Inc., 572 F.2d 574 (7th Cir.1978), particularly if, as here, the parties are negotiating a settlement, Coca-Cola Co. v. Gemini Rising, Inc., 346 F.Supp. 1183, 1192 (E.D.N.Y.1972); Blaw-Knox Co. v. Siegerist, 300 F.Supp. 507, 157 U.S.P.Q. 36, 41-42 (E.D.Mo.1968) or are related. H.A. Friend & Co., Inc. v. Friend & Co., 276 F.Supp. 707, 716 (C.D.Cal. 1967), aff'd 416 F.2d 526 (9th Cir.1969), cert. denied, 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970). There is, moreover, no evidence to support a finding that the LDF has been prejudiced by the passage of time in its ability to recast its public identity in a form sans the initials. It has known for years that a reckoning could come at any time and elected to take its chance that the NAACP would not, even as a last and only resort, force the issue to the point of litigation.
The Court concludes that plaintiff has not lost exclusive control of its initials by acquiescence or laches.

Confusion
The one issue the LDF is unwilling to concede as being presented upon altogether undisputed facts is the extent of public confusion of the two organizations. Such instances of confusion as the record may show, it argues, are isolated or explainable on other grounds, and, most importantly, have been routinely corrected voluntarily by the parties out of mutual respect. The Court disagrees. The significant number of documented instances of confusion submitted by plaintiff, often on the part of those who might be expected to know better, raises the inference that they have been repeated manyfold over the years in circumstances in which documentation of them has been lost or, more likely still, they were never documented at all.
Moreover, the standard for injunctive relief in trademark cases is not actual confusion in the past but the potential for confusion in the future, 15 U.S.C., § 1114(1), and evidence of past confusion is not only unnecessary to plaintiff's burden of proof, to the extent it is shown at all it is probative of the likelihood of its occurring again if the circumstances giving rise to it are not altered. See Foxtrap, Inc. v. Foxtrap, Inc., 671 F.2d 636, 639-40 (D.C.Cir. 1982).
Many public interest groups, in ironic emulation of the structure so successfully employed by plaintiff and defendant in the past, use "legal defense funds" endowed with the parent organization's name to conduct their litigation. People assume that relations between two such entities bearing virtually identical names and committed to the same goals are, at least, symbiotic; to the public, separate treasuries and internecine jealousies are matters of indifference.
The Court finds that to permit the LDF to go its own way while retaining the NAACP initials is likely to result in further public confusion, absent injunctive relief, and defendant has submitted no evidence  as distinguished from argument  to suggest to the contrary.

The Remedy
It has been said that the essence of unfair competition in a common law trademark context is the misappropriation of the labors and expenditures of another, Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2d Cir.1980), and that in an infringement proceeding looking to an injunction in which the basis of the defense is *1345 the passage of time, as with any principle of equity jurisprudence, the equities must be balanced. Id., at 1040.
The LDF says, with justification, that there has been no misappropriation. The universal esteem in which the initials are held is due in significant measure to its distinguished record as a civil rights litigator.[3] The LDF predicts that its ability to attract skilled advocates to continue the tradition will suffer if it must abandon the name in which its reputation was won. The NAACP responds that the LDF is, in essence, a "law firm" (once its law firm) and that the names of law firms can and do change, while nevertheless retaining their reputations for good or ill among those who know about such things. And the NAACP proclaims its own investment in the name, over a considerably longer period and, on more than a few tragic occasions, in more than time and money.
But the NAACP ultimately has a far greater stake in the outcome here. The LDF has heretofore borne the initials they share worthily, and in a common cause; its independence is now, however, a fait accompli, and there is no assurance it will continue to do so hereafter. If the NAACP should lose exclusive control of its mark, which it originated and imbued with meaning for 30 years before the LDF came into being, its identity will forever be linked to the LDF for so long as the LDF chooses to allow it to be so, without, however, the ability to affect the vicarious image it will thus acquire. The LDF, on the other hand, remains, as it has always been, at liberty to dissolve the appearance of a connection between them at will.
The Court concludes, therefore, that the balance of equity lies clearly in plaintiff's favor, and it is, for the foregoing reasons, this 28th day of March, 1983,
ORDERED, that plaintiff's motion for summary judgment is granted and defendant's motion for summary judgment is denied, and an injunction will issue ordering defendant to take appropriate action to amend its corporate charter, to cease and desist from the use of the initials "NAACP" in its name, publications, publicity, solicitations and public representations, and to refrain from the use of any name, service mark, logo, or initials confusingly similar to plaintiff's, upon such terms and conditions as may be hereafter determined to be just; and it is
FURTHER ORDERED, that the parties shall submit proposed forms of injunction in accordance with the above, within ten (10) days of the date of this Order, to be thereafter settled upon notice for hearing if necessary.
NOTES
[1] Even sophisticated contributors who might have been expected to know better made similar mistakes in trying to make contributions to one or the other, and the press would occasionally garble their titles. In cases not involving the LDF, the NAACP moved swiftly to eliminate confusion, as when it successfully sued to enjoin the unauthorized use of its initials by an unrelated organization incorporated under the name of "Rhode Island Chapter NAACP, Inc."
[2] It could also be said to have aspects of the attorney-client relation in which the former is indisputably the servant at sufferance of the latter.
[3] See, e.g., NAACP v. Button, 371 U.S. 415, 421-22, 83 S.Ct. 328, 331-332, 9 L.Ed.2d 405 (1963); Bernard v. Gulf Oil Co., 619 F.2d 459, 470 (5th Cir.1980) (en banc), aff'd, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); Northcross v. Board of Educ., 611 F.2d 624, 637 (6th Cir.1979), cert. denied, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980); NAACP Legal Defense and Educational Fund, Inc. v. Campbell, 504 F.Supp. 1365, 1368 (D.D.C.1981).