**H. A. FRIEND AND COMPANY, Incorporated, an Illinois corporation, Plaintiff,**

v.

**FRIEND AND COMPANY, a California corporation, and Wilber H. Friend, individually and doing business as Friend Paper Company, Defendants.**

**H. A. FRIEND AND COMPANY, Incorporated, an Illinois corporation, Plaintiff,**

v.

**FRIEND AND COMPANY, a California corporation, and Wilber H. Friend, individually and doing business as Friend and Company, Defendants.**

**Nos. 64–805–WPG, 66–470–WPG.**

United States District Court
C. D. California.

Dec. 5, 1967.

Alberts, Brezina & Lund, John C. Brezina, and Joe C. Young, Chicago, Ill., Harris, Kiech, Russell & Kern, Charles E. Wills, Los Angeles, Cal., for plaintiff.

Angus & Mon, D. Gordon Angus, Pasadena, Cal., for defendants.

WILLIAM P. GRAY, District Judge.

## MEMORANDUM OF DECISION

H. A. Friend and Company, Incorporated, the plaintiff in each of the two cases here concerned, is owned by the youngest three of the four sons of Harley A. Friend, who was the founder of the business now operated by the plaintiff, and who died in 1959. His oldest son, Wilber, is the individual defendant and the principal owner of the corporate defendant, Friend and Company, which he formed and has operated under circumstances that brought about this bitter litigation. The complaints in these two actions charge the defendants with unfair competition, trademark infringement, and false description and advertising of stationery that they sell in competition with the plaintiff. Each of these charges is well founded, as will be discussed in this Memorandum of Decision.

### THE BACKGROUND FACTS

Harley A. Friend began to engage in the stationery business in Zion, Illinois, in 1908 and remained active in that business until his death. By 1920, he was the principal owner of H. A. Friend and Company (the Company), which was located in Zion. The Company specialized in preparing and selling at retail printed and engraved stationery to members of the legal profession, principally in the mid-western part of the United States. In about 1930, Harley's son, Wilber, became a full-time employee, and in the ensuing years he was allowed to assume more and more of the management of the business of the Company.

The principal source of the paper processed and sold by the Company was the mill operated by the Gilbert Paper Company (Gilbert), of Menasha, Wisconsin. Inasmuch as the Company was a retailer, it presumably could not obtain its paper directly from Gilbert, but instead was obliged to purchase through a wholesaler. In the early years, the wholesaler so used was the Moser Paper Company. However, by the mid-thirties, the volume of the Company's paper purchases had increased substantially, with the result that an arrangement was made with Gilbert whereby the Company, in effect, might have the price benefits that would flow from being able to purchase directly from the mill. Accordingly, the Company caused to be formed the Friend Paper Company, which bought paper directly from Gilbert and sold it to the Company. The Friend Paper Company was not incorporated, and it appears to have had no formal beginning. It simply began to place with Gilbert orders for paper that the Company needed in its retail business. The Friend Paper Company never had any employees, and almost from its inception its "business" was conducted solely by Wilber, partly at his office in the headquarters of the Company with the clerical assistance of Company personnel, and partly at his home.

By the end of 1940, the two next oldest sons of Harley A. Friend had also become employees in their father's business, and, on December 31, 1940, he gave to each of them, and to Wilber, partnership interests in the Company effective January 1, 1941. The partnership agreement that they all signed on that date provided that each active partner should devote full time to the partnership business, should " * * * be faithful to all of the other partners in all transactions relating to the firm," and should not " * * * engage in any busines or activity which in any way does or may conflict with or operate to the detriment of the partnership business." The agreement further provided that Wilber should have the responsibility of the general management of the entire business, and he did continue to assume such responsibility as long as he remained a partner. Harley's youngest son, William, was made an active partner in 1946, following his return from military service.

Prior to the time of the formation of the partnership, the Company had begun the practice of publicizing its stationery as being in "The Banner Line", the quoted words usually being displayed as superimposed on a drawing of a pennant or

banner. Its stationery was also advertised as "Friend's Papers", and more particularly as "Friend's Typewriter Papers", "Friend's Legal Linen", and the like. The imprinting on its stationery boxes and wrappings and its promotional material emphasized the fact that the Company was located in Zion, Illinois, and had been in operation since 1908. These same practices continued after the formation of the partnership and right up to the present time.

By 1948, although most of the Company's customers were law offices located in the central part of the United States, a scattering of customers had developed in almost all, if not all, of the states west of the Rocky Mountains. Many of these customers were lawyers who had moved westward and wanted to continue to buy "Friend's Papers"; others had been referred to "Friend's" by satisfied purchasers. Such contacts usually were renewed or established by mail; the Company carefully maintained and serviced them all; and in most instances the letters in response to inquiries and orders for merchandise were personally dictated and signed by Wilber.

By about 1948, the Company had compiled addressograph plates that included the names and addresses of more than 1,500 lawyers and law firms located in the western states, and it sent to all of them at least one promotional brochure. It was the active intention of the Company to attract as rapidly as practicable and to hold customers throughout the area between Illinois and the west coast of the United States.

In the latter part of 1948, for reasons that are not important to this decision and will not be discussed, Wilber withdrew from, or was removed from, the Company, and his capital interest therein, including goodwill, was purchased by his father. The partnership was dissolved on December 31, 1948, and a new partnership was thereupon formed by Harley and his three remaining sons, which continued the business of the Company under the same name. The plaintiff Corporation was formed in 1961 to become the successor to the Company and has operated the business ever since. (The plaintiff and the Company will hereinafter be referred to as the plaintiff.)

In the early spring of 1949, Wilber announced to his father and brothers the intention of moving to Pasadena, California, and engaging in the business of buying and selling paper at wholesale under the name of Friend Paper Company. His former partners expressed no objection to this; they ceased using that name for the operation through which they bought paper from the mills; and they began performing these transactions under the name, Friend Paper Products Company.

## THE UNFAIR COMPETITION

Wilber did move to Pasadena, and he went into the stationery business in 1950. But his principal activity was not that of a wholesaler of paper; instead, he engaged in precisely the same type of retail operation that the plaintiff had been conducting in Zion for so many years. He did not adopt completely the name of his father's partnership, namely H. A. Friend and Company; he simply left off the "H. A.", and called his business "Friend and Company". (Wilber later incorporated his business, and such corporation is made a defendant in this action. He and it will sometimes hereinafter be referred to as the defendants.)

In 1955, Wilber published and began to distribute a large stiff-covered catalogue, on the cover of which appeared in large letters the words, "Friend's Quality Papers". At the head of the first inside page is the word "Friend's" in relatively very large type. At the bottom of the page is the assertion that the catalogue is presented by the *Western Division* of Friend and Company. The following page is headed by a map of the United States. An asterisk is placed thereon at about the location of Zion, Illinois, and is identified as "General Offices". The western half of the continent is shaded, and a star appears at the location of Pasadena, California, with the explanation "Shaded area served

from Western Division Pasadena, California." The following text states that "The Friend organization has served the legal profession nationwide with quality products for fifty years. We were the first concern in the United States selling exclusively to attorneys." Farther down the page is the assertion that Friend and Company has been "—selling by direct mail and through representatives since 1908 * * *", and on the next page is a picture of Wilber with the statement that he has been "manager of the Western Division in Pasadena, California since 1949".

The catalogue also advertises stationery known as Barrister Bond, Friends Bond, and Banner Bond, which are the same trademarks and watermarks that the plaintiff has been using since long before Wilber left Illinois.

The publication just described asserts that it is "Catalog No. 47" (1908 plus 47 equals 1955, the year of its publication). About 1,000 copies of that catalogue were distributed during the next several years. In 1964, Catalog No. 47 was superseded by a new catalogue which, as might be expected, was designated as "Catalog No. 56". Its format is substantially the same as No. 47, except that it expands a bit upon the earlier misrepresentations.

It is evident from the foregoing description of the catalogues, as well as from other evidence at the trial, that the catalogues were carefully and fraudulently designed to convey the impression that the Pasadena business was a division of H. A. Friend and Company of Zion, Illinois. Wilber's protestations to the contrary in his testimony were simply unbelievable and served only to give further emphasis to this obvious conclusion. For example, in response to an inquiry as to the justification for the reference, in the 1955 catalogue, to his "General Offices" as being in Illinois, he made the amazing response that his fifteen year old son lived in Zion in that year and there received mail addressed to the defendants' business. He justified the similar reference to "General Of-

fices" in the 1964 catalogue by saying that, although by that time his son was no longer in Zion, he had a Post Office box in that city.

The record reveals other proof which shows beyond doubt that Wilber sought regularly to convey and cultivate the false impression that appears so vividly in his catalogues. Between 1951 and 1953 he sent out a circular letter to law offices in the western states, including many customers of the plaintiff, in which he announced the opening of a Western Division and urged that future orders be forwarded to Pasadena where they could be expedited and result in a saving in freight charges, in comparison with the "east", impliedly Zion. In his correspondence and in his personal contacts with prospective customers, whenever any inquiry arose concerning the relationship between the Friend organization in Zion and his Pasadena operation, he actively implied or, at the very least allowed the inference, that they were one and the same. For example, in one instance he responded to a letter of inquiry from an obviously confused former customer of the plaintiff, by assuring him that "We will get your die from our Zion plant."

█ In summary, this Court finds that Wilber, from the beginning of his Pasadena venture, tried, in every way he knew how, to capture for himself the goodwill that his father's company (the plaintiff) had developed among law offices in the western states. It is equally apparent that in this he was very successful. The many letters and depositions introduced into the record reveal that a substantial number of lawyers purchased their stationery from the defendants in the mistaken belief that they were dealing with the Western Division of the plaintiff.

Judge Learned Hand said, almost forty years ago, that

"The law of unfair trade comes down very nearly to this—as judges have repeated again and again—that one merchant shall not divert customers

from another by representing what he sells as emanating from the second. This has been, and perhaps even more now is, the whole Law and the Prophets on the subject, though it assumes many guises." Yale Electric Corp. v. Robertson, 26 F.2d 972, 973 (2d Cir. 1928).

What the above quotation proscribes is precisely what the defendants have been doing regularly ever since they first began business in Pasadena. The plaintiff is entitled to an injunction against further conduct of this sort. Stork Restaurant v. Sahati, 166 F.2d 348 (9th Cir. 1948).

■ The trade name, Friend and Company, is very similar to that of H. A. Friend and Company, and the record shows clearly that confusion has resulted in the minds of customers and prospective customers throughout the western states. A court should be reluctant to limit a person in the use of his own name in his business. However, in the case at hand, Wilber has been using the Friend name, not simply to identify his own business, but rather as a means of seeking wrongfully to identify his business with that of another. Under such circumstances, his right to use that name must be substantially limited, in order to overcome the confusion that he already has created and to remove the likelihood of further confusion. See L. E. Waterman Co. v. Modern Pen Co., 235 U.S. 88, 35 S.Ct. 91, 59 L.Ed. 142 (1914); A. E. Staley Mfg. Co. v. Staley Milling Co., 253 F.2d 269 (7th Cir. 1958); Brooks Bros. v. Brooks Clothing of California, 60 F. Supp. 442 (S.D.Cal.1945), *affirmed* 158 F.2d 798 (9th Cir. 1947).

■ The defendants, with respect to any business or activity involving the sale of paper of any kind to the consumer, will be permanently enjoined as follows:

(a) From using the word, "Friend", in any manner or form, as a trade name, unless:

(1) It is directly preceded by the word, "Wilber", in letters of the same size and style; and

(2) It is closely accompanied by the parenthetical prhase, "Not affilated with H. A. Friend and Company of Zion, Illinois".

(b) From using the word, "Friend", in any manner or form, as a trademark or in advertising or promotional material, unless it is directly preceded by the word, "Wilber", in letters of the same size and style.

(c) From asserting or in any manner implying that the defendants' business began at any time prior to 1950, or that it had or has any relationship with Zion, Illinois, or that it or its Pasadena establishment is a division of any other company.

## THE TRADEMARK VIOLATIONS

As hereinabove noted, the plaintiff has been using various trademarks in connection with the business of selling stationery at retail ever since long prior to 1941. Such use of the trademarks included their being affixed as watermarks upon the paper itself in the process of manufacture, through the use of "dandy rolls" in some mysterious manner that the paper mill operators understand.

When the Friend Paper Company was formed, the plaintiff purchased its requirements for paper bearing its various watermarks through Friend Paper Company. The reason for doing so was to obtain for the plaintiff the price benefits accorded a wholesaler, as is discussed earlier in this memorandum. It also has been mentioned herein that Wilber was in charge of the "business" of Friend Paper Company from the time that he was an employee of his father's organization (the plaintiff).

Wilber now says that he *was* Friend Paper Company, that from the beginning it was his sole proprietorship, and that during the entire time that he was operating it in Zion he was doing so for his own account. He further testified that he even made a profit on the paper that Friend Paper Company purchased from the mill and resold at a larger price to his father's company. He contends that inasmuch as he, through Friend Paper

Company, has been purchasing and selling paper that was marked or otherwise identified with the trademarks here concerned, they somehow have become his trademarks and he has a right to continue to use them. In fact, he has been using several of them in his Pasadena establishment.

■ The short answer to Wilber's contention is that, whether he knew it or not, during the entire time that he was operating Friend Paper Company in Zion, he was doing so as a fiduciary representative, or a constructive trustee, of H. A. Friend and Company and its owners (the plaintiff). One of the best established principles of law is that a person who is dealing with a business as a partner, or in any other relationship of trust, may not take for himself any profit or advantage that he might obtain for the firm, without first making full disclosure to all of the owners of the firm and obtaining their full consent. Restatement of Restitution § 190 et seq. (1937).

The evidence clearly shows that Wilber made no disclosure to his father or his brothers that he was using Friend Paper Company for his own benefit. Their understanding, which Wilber carefully encouraged, was that he was operating Friend Paper Company as a part of his function as principal manager of H. A. Friend and Company, and that the former was being operated solely for the benefit of the latter.

■ Under well established fiduciary principles, Wilber acquired no individual rights in or to any of the trademarks with which he was dealing while he was affiliated with H. A. Friend and Company. Insofar as the parties to this action are concerned, the entire rights in and to such trademarks remain in the plaintiff.

■ One of such trademarks is "Friends", which, as has been mentioned earlier in this memorandum, the plaintiff has been using for many years. In 1957, the plaintiff obtained from the United States Patent Office Registration No. 655,848 covering this trademark. Insofar as the defendants are concerned, the plaintiff owns the trademark and it is valid and subsisting. The defendants have been infringing the trademark; such infringement has created actual confusion and the likelihood of further confusion; the defendants will be permanently enjoined from further violations. 15 U.S.C. § 1116; Tisch Hotels, Inc. v. Americana Inn Inc., 350 F.2d 609 (7th Cir. 1965).

■ The plaintiff also has been using for many years the trademark, "Banner", and has filed with the Patent Office Trademark Application Serial No. 206,253 for the purpose of registering this mark. The defendants have filed notice of opposition to such application, and the matter is being held in abeyance in the Patent Office pending the outcome of this litigation. For the reasons hereinabove mentioned, the defendants have no right to the use of the word, "Banner", in any form as a trademark; the defendants have been wrongfully infringing that trademark; such infringement has created actual confusion and the likelihood of further confusion; the defendants will be enjoined from further infringement and from further opposing the plaintiff's application for registration.

■ The plaintiff has been using the trademark, "Barrister Bond", ever since prior to 1926. Trademark Registration No. 274,875 was issued to Gilbert in 1930 and was renewed for twenty years on September 9, 1950. Gilbert held the registration in trust for the plaintiff until January, 1965, and then formally assigned it to the plaintiff. The assignment was duly recorded in the Patent Office.

From the very outset of their stationery business in Pasadena, the defendants have advertised "Barrister Bond" stationery as being one of their prime items of merchandise. By so doing, they have infringed the plain-

tiff's valid and subsisting trademark; such infringement has created actual confusion and the likelihood of further confusion; the defendants will be enjoined from further violations.

In actuality, as the defendants well knew, they were not able to deliver to their customers any paper bearing the "Barrister Bond" watermark, because Gilbert honored the exclusive right of the plaintiff to such trademark and would not sell paper containing it to the defendants. Accordingly, whenever a customer ordered "Barrister Bond" paper from the defendants, the latter would fill the order by shipping paper carrying the watermark, "Bar Bond", which Gilbert was willing to manufacture and supply to the defendants. In his testimony at the trial, Wilber's explanation of this practice was his assertion that "Bar" (even without the period) is simply an abbreviation of "Barrister". This seemed a bit surprising, but the Court feels that, under all of the circumstances, it should accept such explanation. Accordingly, the defendants will also be enjoined from further use of the "abbreviation", namely, "Bar Bond".

## THE FALSE DESCRIPTION OF MERCHANDISE

From the time that Wilber first opened his Pasadena business, and until after this litigation was commenced, he caused his corporation to advertise his "Barrister Bond" stationery as containing 100% cotton fibre. He also advertised his "Friend's Title Linen" as having 50% cotton fibre. In actuality, about 80% of the envelopes that he delivered in response to orders for "Barrister Bond" had a cotton fibre content of 20%, and all but 5% of the "Title Linen" that he sold either contained only 25% cotton fibre, or was made of sulphite, which had no rag content whatever.

According to Wilber's own admission, the relative mill costs per pound of these types of paper are 100% cotton—60¢; 50% cotton—40¢; 25% cotton—30¢; and sulphite—26¢ and lower.

An officer of Gilbert testified without contradiction that, in general, the usable longevity of paper is measured in years in direct proportion to its rag content, e. g., 100% cotton fibre should last 100 years, 25% cotton fibre—25 years, etc. He also established that the higher the percentage of cotton fibre, the better is the quality of the paper with respect to folding, tearing, erasability, etc.

The plaintiff has contended in its pleading and at the trial that such false description by the defendants of their goods has made them liable to the plaintiff pursuant to 15 U.S.C. § 1125(a).[1]

█ This Court agrees with the plaintiff, and holds that the foregoing constitutes another aspect of unfair competition for which the defendants are liable to the plaintiff. The defendants clearly are in competition with the plaintiff in the western states, and anyone who, while purporting to sell merchandise that matches the quality of competing products, actually sells goods of much reduced quality and cost to him, gains an unfair advantage over his competitors. Moreover, of much greater concern to the plaintiff from the standpoint of damage is the likelihood that in future years people who have bought stationery from the defendants will become aware of its poor quality and will quietly determine never again to purchase "Friend's" papers. Because of the manner in which the defendants have fraudulently linked their own operation with that of the plaintiff, it is impossible to determine the full extent to which the false descriptions herein concerned have

1. 15 U.S.C. § 1125(a) reads in pertinent part as follows:

"Any person who shall * * * use in connection with any goods * * * any false description or representation * * * tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, * * * shall be liable to a civil action * * * by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

damaged the plaintiff already and will cause further injury in the future.

"Although section 43(a) [15 U.S.C. 1125(a)] makes no reference to injunctive relief, it is within the general power of a court of equity to grant it." 1 Callmann, Unfair Competition Trademarks and Monopolies, Section 18.2(b) (Third Edition 1967).

The plaintiff is entitled to, and will be accorded, an injunction against further misrepresentations by the defendants concerning the quality of their merchandise. See Chamberlain v. Columbia Pictures Corp., 186 F.2d 923, 924 (9th Cir. 1951).

## USE OF THE NAME, FRIEND PAPER COMPANY

■ The record indicates that when Wilber announced his intention, in 1949, to engage in the *wholesale* paper business in California, none of his former partners raised any objection to his using the name, Friend Paper Company, in that type of operation. They reasonably concluded that no inherent confusion of identity would result from such an arrangement, inasmuch as the plaintiff's sales have regularly been exclusively at retail to the consumer. Accordingly, nothing in this memorandum is intended to mean that Wilber is to be prevented from using the name, Friend Paper Company, in connection with the business of selling paper at *wholesale* to stationers and other retailers of paper, in contradistinction to sales made to the user or the consumer. As to the latter types of sales, and in all other respects, the injunctions announced in this memorandum shall apply to Friend Paper Company as well as to Wilber in all of his other capacities and to the corporate defendant.

## THE ABSENCE OF LACHES

■ The record shows that in April, 1957, Harley A. Friend was made aware that a law firm in Seattle was "taken in" by Wilber's course of conduct in seeking to create the hereinabove described confusion concerning the relationships between the Zion and Pasadena companies. However, he took no action with respect to the matter prior to his death two years later, nor did he inform his other sons, who were his partners, concerning it. Perhaps such inaction stemmed from a father's natural reluctance to conclude the worst concerning his son, or from his hope that the incident reported to him had been an isolated one. In any event, the first knowledge that Richard, Howard or William had of Wilber's fraudulent conduct was in August, 1962, when William went to Albuquerque, New Mexico, on a sales promotion trip and saw the defendants' catalogue in a lawyer's office.

· The plaintiff sent to the defendants a demand for discontinuance on August 28, 1963, and after considerable subsequent correspondence, the plaintiff caused a complaint to be filed in the United States District Court for the Eastern District of Illinois late in 1963 or early in 1964. Wilber thereupon persuaded that Court that neither he nor his company had been doing business in Illinois since 1949(!). The complaint was therefore dismissed, and the present action was filed promptly thereafter.

Under these circumstances, the Court finds that the facts show an absence of laches, and discussion of the legal points raised by the parties on this subject becomes unnecessary.

## RECOVERABLE DAMAGES AND ATTORNEYS FEES

■ The record shows beyond doubt that the hereinabove discussed acts of trademark infringement on the part of the defendants resulted in damages to the plaintiff. By means of such acts, the defendants deceived many of the plaintiff's regular customers into transferring their business to Wilber's new Pasadena "Division". In other instances, potential customers of the plaintiff who had heard favorably of the Zion company were misdirected to the defendants as a result of the confusion of identity that the defendants intentionally created. Most of the sales thereby lost by the

plaintiff to the defendants quite apparently were small in dollar amount; and to seek to identify each of them through an accounting would be relatively expensive and basically impracticable. However, the Court interpolates and finds from the evidence presented that the plaintiff's actual damages in the respects here under discussion are at least the sum of $5,000.00. The Court further finds that, because of the particular circumstances of the case, including the aggravated nature of the offense and the expense and inconvenience of prosecuting this litigation, judgment should be and will be awarded in three times the amount of actual damages, or $15,000.00, under authority of 15 United States Code, section 1117.

█ As hereinabove noted, the misrepresentations that the defendants have made in violation of 15 U.S.C. § 1125(a) have resulted and will result in substantial injury to the plaintiff, even though the full extent thereof cannot precisely be shown. The Court finds that the plaintiff's damages as a result of such misrepresentations by the defendants are not less than $20,000.00, and judgment in that sum will be awarded.

█ Inasmuch as the Court has found the defendants' acts to have been wilful and calculated to trade upon the plaintiff's goodwill, the defendants will be ordered to pay to the plaintiff the sum of $30,000.00 for attorneys fees reasonably incurred in this action. National Van Lines v. Dean, 237 F.2d 688 (9th Cir. 1956).

Thus, the total monetary judgment against the defendants and each of them will be $65,000.00, plus costs to be taxed in the usual manner.

It is intended that this memorandum shall constitute findings of fact and conclusions of law, as provided for by Rule 52(a) of the Federal Rules of Civil Procedure. A judgment in accordance herewith is being filed.