**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, aka NAACP**

v.

**N.A.A.C.P. LEGAL DEFENSE & EDUCATIONAL FUND, INC., Appellant.**

No. 83–1719.

United States Court of Appeals, District of Columbia Circuit.

Argued May 3, 1984.

Decided Jan. 25, 1985.

As Amended Feb. 26, 1985.

Jay Topkis, New York City, of the Bar of the United States Supreme Court, pro hac vice, by special leave of the Court and William T. Coleman, Jr., Washington, D.C., with whom Vernon E. Jordan, Jr., Daniel

Joseph, Randall L. Sarosdy and Barrington D. Parker, Jr., Washington, D.C., were on the brief, for appellant. Sidney S. Rosdeitcher, Washington, D.C., also entered an appearance for appellant.

Edward W. Brooke, Washington, D.C., with whom Barry J. Cutler and Judith Hall Howard, Washington, D.C., were on the brief, for appellee.

Before MIKVA and BORK, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

Two civil rights organizations contend for the right to use the initials "NAACP" as their trademark. The National Association for the Advancement of Colored People (the Association) alleges that the continued use of the NAACP initials by the NAACP Legal Defense and Education Fund, Inc. (the LDF) constitutes a trademark infringement.[1] The LDF replies that the Association irrevocably granted it the right to use the initials. The LDF also maintains, *inter alia*, that the Association's suit is barred by laches. In the district court, both sides moved for summary judgment.[2] The court granted the Association's motion and ordered the LDF to refrain from using the NAACP initials.

Because the district court erred in denying the LDF's defense of laches, its judgment is reversed.

## I. BACKGROUND

The material facts are undisputed.[3] The Association, known as "the NAACP," was founded in 1909,[4] and listed among its goals:

to promote equality of rights and eradicate caste or race prejudice among the citizens of the United States; to advance the interests of colored citizens; to secure for them impartial suffrage; and to increase their opportunities for securing justice in the courts, education for their children, employment according to their ability, and complete equality before the law.[5]

The Association has sought to achieve its goals through educational work, legislative activity, and litigation.[6]

As early as 1936,[7] the Association's Board of Directors voted to organize a national defense fund to raise money for its litigation program.[8] Besides serving as a means to ensure on-going financing of civil rights litigation, the creation of the LDF provided an important tax advantage.[9] The Bureau of Internal Revenue had ruled that contributions to the Association were not deductible for federal income tax purposes because of the Association's lobbying

1. Trademark Act of 1946 ("Lanham Act") As Amended, 15 U.S.C. §§ 1114, 1125 (1982).

2. The two parties "agreed that the passage of time has rendered further illumination of the facts ... both unlikely and unnecessary." *NAACP v. NAACP Legal Defense and Educ. Fund, Inc.*, 559 F.Supp. 1337, 1339 (D.D.C.1983).

3. *See id.* The district court noted that the parties' "differences [regarding the facts] are principally semantic." *Id.*

4. The Association was incorporated in New York in 1911. NAACP Certificate of Incorporation, Appellee's Exhibit 1 at 3 [hereinafter cited by Exh. and page].

5. *Id.*, Exh. 1 at 1–7.

6. The Association is a membership organization. NAACP 1981 ANNUAL REPORT, Exh. 2 at 9–10.

7. For the first two decades, the Association's legal program brought cases on an *ad hoc* basis in an effort to address issues important to the Association's aims. Unpaid legal volunteers often performed these legal services, and any modest litigation expenses were paid by the Association's National Office or by direct contributions for the particular case. During the 1930's, however, the Association expanded its litigation program, targeting key areas of racial discrimination, including education, voting, housing, and the administration of criminal justice. *Report on the NAACP Legal Program and the Relationship of the Inc. Fund to that Program* (Dec. 21, 1961), Exh. 4 at 15.

8. *See* Minutes of the Association's Board of Directors Meeting (Apr. 13, 1936), Exh. 6 at 24.

9. Appellee's Brief at 8.

work. Hence, the creation of a separate organization to perform the Association's legal work allowed contributors wishing to support its nonpolitical activities to receive tax deductions.[10]

The Association's Board of Directors was informed by the New York Secretary of State that a certificate of incorporation could be processed only if the new corporation obtained "consent" from the Association to the use of the NAACP initials.[11] The Association's Board of Directors then passed the following resolution on October 9, 1939:

> BE IT RESOLVED, That the Board of Directors of the National Association for the Advancement of Colored People *grant permission for the use of the initials,* "N.A.A.C.P." by the "N.A.A.C.P. Legal Defense and Education Fund, Inc." and authorize the President and Secretary to execute whatever papers might be necessary to carry out this resolution.[12]

The State of New York approved the incorporation of the LDF in 1940.[13]

From 1940 to 1957, the LDF served as a subsidiary of the Association. Although funds were kept in separate accounts, all the LDF's first directors were members of the Association's board.[14] The Association solicited contributors by explaining that they could help the Association by making tax-deductible contributions to the LDF.[15] Apparently some gifts contributed directly to the Association were placed in the LDF fund, and the contributor was then notified that his contribution was deductible for federal income tax purposes.[16] The allocation of contributions between the LDF and the Association was not based upon who made the solicitation, but upon the purpose for which the money was used—so funds used for lobbying could only go to the Association, while funds used for litigation would go to the LDF.[17]

During this initial period, the LDF was under its progenitor's direct control. The two organizations had common directors, offices, and staff.[18] Throughout the 1940's and into the 1950's, the LDF was guided by the Association's National Office's policy decisions regarding the handling of litigation. In particular cases, the Association's Board of Directors' approval was sought before proceeding.[19] The LDF, as the legal branch of the Association, routinely handled general legal matters of the Association.

In 1957, however, the LDF and the Association mutually agreed to the LDF's independence. A gradual shift in that direction had suddenly been accelerated by external forces. The U.S. Treasury Department and several Southern state officials challenged the LDF's tax-exempt status.[20] The

---

10. *Id.*

11. H. Herman Zand Affidavit (Apr. 8, 1983), ¶ 4.

12. Minutes of the Association's Board of Directors Meeting (Oct. 9, 1939), Exh. 14 at 39 (emphasis added).

13. *See* LDF's Certificate of Incorporation, Exh. 19 at 46; James M. Nabrit, III, Affidavit (Apr. 13, 1983); *see also* Appellant's Brief at 6.

14. *See* Memorandum from Thurgood Marshall to Walter White and Arthur B. Springarn (July 27, 1939), Exh. 17 at 42–43.

15. *See, e.g.,* letter from John D. Rockefeller III (by his assistant Mary Campbell) to Walter White (May 7, 1940), Exh. 25 at 60.

16. *See, e.g.,* letter from Walter White to Margaret and Corliss Lamont (May 15, 1941), Exh. 27 at 62.

17. *See* Memorandum from Walter White to Edward Dudley (June 6, 1945), Exh. 42 at 78.

18. Appellant's Brief at 7. From 1940 to 1957, the LDF became increasingly independent. In 1941, the LDF began its own fund-raising, and its board did include some members who were not directors of the Association. The Fund moved into its own offices in 1952. By 1953, the LDF had its own separate annual budget. *See* Appellant's Brief at 7.

19. *See, e.g.,* Minutes of the LDF's Board of Directors Executive Committee Meeting (Oct. 8, 1951), Exh. 47 at 83–84.

20. *See* LDF Press Release, *Facts About the Relationship Between the N.A.A.C.P. Legal Defense and Educational Fund, Inc. (LDF) and the National Association for the Advancement of Colored People (NAACP)* (Apr. 16, 1979), Exh. 51 at 100. In a hostile reaction to *Brown v. Board of*

Southern state officials claimed that the LDF had too close a relationship with the Association, which was engaged in lobbying and political activities.[21] The U.S. Treasury Department objected to the sharing of board members and the NAACP initials.[22] In response, the Association and LDF decided that the LDF should retain its NAACP initials but should sever all direct connections with the Association.[23] On May 16, 1957, the LDF's board adopted a resolution that "no person should be a Board member, officer or employee of this corporation who is also a Board member, officer or employee of the N.A.A.C.P." [24]

The board, budget, staff, and program of both organizations were completely separated.[25] The LDF now came under the direct control of its own board of directors. Since 1957, the LDF has spent over eleven million dollars soliciting contributions using the NAACP initials.[26] The LDF continued to function as the Association's outside counsel, and coordinated its efforts with those of the Association in cases directly involving the Association's branches and individual members.[27] However, the LDF also sought other clients who had no connection with the Association.[28]

The independence of the LDF from the Association was reported to the Treasury Department which never again challenged the LDF's tax-exempt status.[29] Donations occasionally made to the wrong organization were forwarded to the intended beneficiary. Contributors were instructed about the tax deductibility of their donations,[30] as well as advised about the total separateness of the two organizations.[31]

Because such scrupulous organizational separation precluded "direct and formal control of the Inc. Fund [LDF] by the NAACP Board," [32] cooperation between the two parties relied upon personal ties and common policy interests. But by the 1960's, however, tensions between the two organizations became evident,[33] despite the formation of several liaison committees established between 1960–62 and 1965–66.[34] These strained relations resulted from a heightening of direct competition in fundraising.[35] There was also a dispute over

Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), several Southern attorney generals ordered production of the Association's records and membership lists seeking to find any information of non-compliance with state law. See Appellee's Brief at 19.

21. See Exh. 51, supra note 20.

22. John Hammond Affidavit (Apr. 8, 1983), ¶ 3; see also Appellant's Brief at 8.

23. Hammond Affidavit, supra note 22.

24. See Appellant's Brief at 8; Appellee's Brief at 20.

25. See Exh. 51, supra note 20, at 93.

26. Nabrit Affidavit, supra note 13, ¶ 3.

27. See Appellant's Brief at 7.

28. These clients included Dr. Martin Luther King, thousands of freedom marchers, and thousands of victims of discrimination in education, in employment, and in the application of capital punishment laws. Jack Greenberg Affidavit (Apr. 11, 1983), ¶ 7.

29. See Appellant's Brief at 8; see also Houck, With Charity for All, 93 Yale L.J. 1415, 1440–41 (1984).

30. See Letter from Kivie Kaplan to Thurgood Marshall (June 15, 1961), Exh. 82 at 156; Letter from Kivie Kaplan to Thurgood Marshall (Feb. 20, 1961), Exh. 83 at 157; Letter from Roy Wilkins to N.L. McMahon (Sept. 22, 1961), Exh. 84 at 158.

31. See, e.g., Letter from John Morsell to Anne Gerber (Nov. 17, 1966), Exh. 99 at 197. The single issue that the parties are "unwilling to concede as being presented upon altogether undisputed facts is the extent of public confusion of the two organizations." 559 F.Supp. at 1344. However, this factual disagreement is not material to the ultimate outcome of this case, which we base upon the defendant's laches defense.

32. Report of the Liaison Committee with Inc. Fund Board (Apr. 6, 1982), Exh. 90 at 171; see also Appellee's Brief, at 26.

33. See 559 F.Supp. at 1340.

34. Minutes of the Association's Board of Directors Meeting (Apr. 9, 1962), Exh. 91 at 180; see also Appellee's Brief at 23–32.

35. In 1965, the Association became a direct competitor with the LDF for tax-exempt contributions when it established the "NAACP Special Contribution Fund." See Minutes of the Association's Board of Directors Meeting (Jan. 6,

who should take public credit for successful civil rights litigation.[36]  Although both organizations publicly attempted to deemphasize any explicit competition,[37] the tensions between them continued to heighten.[38]

In July 1965, the Association's Board adopted a resolution [39]:

> it was VOTED that the Inc. Fund [the LDF] be approached by the Chairman of the Board, the Executive Director, the Treasury, and the Chairman of the Special Contribution Fund for the purpose of requesting the Inc. Fund to voluntarily reincorporate under a name that does not include NAACP; or to bring the Inc. Fund back into Special Contribution Fund status; and, *if they refuse to do so, the NAACP should go into court and enjoin them from use of the name NAACP.*[40]

The Association's Executive Director orally conveyed this request and threat of suit to the Director of the LDF, who rejected the demand.[41]  At the Association's September 12, 1965 meeting, the Association's Board formally withdrew the language of its resolution threatening suit.

> The Executive Director reported that the Legal Committee has suggested that a phrase in the July 2, 1965, minutes [page 4], to wit: "and, if they refuse to do so, the NAACP should go into court and enjoin them from use of the name NAACP," be stricken from the minutes .... [B]ecause of the feeling of the Legal Committee that it was impolitic to have such a phrase on record and, additionally, that it would have no standing in court, it was voted unanimously, on motion by Mr. Alexander, duly seconded, that the phrase be stricken from the minutes .... [42]

Thereupon, the Association's Executive Director told the Director of the LDF that the threatening language had been withdrawn.[43]  On February 24, 1966, representatives of both sides met to discuss their relationship.  It was suggested again that the LDF change its name but the LDF declined.[44]

During the next twelve years, from 1966 through 1978, the Association remained silent concerning the LDF's use of the NAACP initials.[45]  The Association did not give clear notice to the LDF about reserving its exclusive claim to the NAACP initials.  There were no negotiations.  Cooperative interchanges between the LDF and the Association's attorneys waned.[46]  The Association itself indicated that during this time, the LDF "pursued an independent course of action ... without consultation with the NAACP as to either policy or program." [47]  At least since 1966, the LDF

---

1964), Exh. 105 at 206.  The LDF's traditional reliance on large corporate and foundation grants was correspondingly broadened to include small-gift contributions.  *See* Appellee's Brief at 29–30.

**36.** Each made accusations that the media was being manipulated by the other in assigning historical credit for civil rights advances that the organizations should have shared.  *See* Appellee's Brief at 26–27.

**37.** *See, e.g.,* Letter from John Morsell to L.H. Grunebaum (Aug. 11, 1967), Exh. 104 at 204; Letter from Percy Julian to Kivie Kaplan (May 13, 1967), Exh. 106 at 209.

**38.** *See* Appellee's Brief at 31.

**39.** Minutes of the Association's Board of Directors Meeting (July 2, 1965), Exh. 93 at 186.

**40.** *Id.* (emphasis added).

**41.** Jack Greenberg Affidavit (Dec. 7, 1982), ¶¶ 3, 4.  This dialogue was further explicated during oral argument.

**42.** *Id.,* Exh. B.

**43.** *Id.,* ¶ 5.

**44.** *See* letter from Julius Chambers to Margaret Wilson and Benjamin Hooks (Jan. 5, 1979), Exh. 142 at 262.

**45.** 559 F.Supp. at 1341; *see* Appellant's Brief at 10.

**46.** *See* letter from Julius Chambers to Margaret Wilson (May 29, 1980), Exh. 159 at 293.  The Association had its own staff attorneys.

**47.** Emergency Resolution Calling for the Withdrawal and Revocation of Permission To Use the NAACP Initials by the NAACP Legal Defense

has included a disclaimer on its stationery disavowing any present relationship with the Association.[48] During this period of no negotiations, the LDF continued to build up its goodwill—indeed, these were the salad days for the LDF's litigation practice.[49] The LDF continued to spend time and millions of dollars in soliciting gifts and recruiting legal talent using the NAACP initials.[50] Many public interest groups now use the term "legal defense fund" in emulation of the LDF's success.[51]

Negotiations were initiated by a letter from the Association to the LDF on December 29, 1978. The correspondence indicated concern about confusion stemming from LDF's use of the NAACP initials.[52] On June 28, 1979, the Association's board adopted a resolution that rescinded the resolution of October 9, 1939 and revoked permission to use the NAACP initials. The Association registered the NAACP initials with the Patent and. Trademark Office on January 26, 1982. On May 25, 1982, the Association initiated this suit.[53]

The Association alleged that its 1939 resolution granted only a revocable license for use of the NAACP initials, and that the LDF's continued use of the initials constituted a trademark infringement. In response the LDF maintained that the 1939 resolution was an irrevocable grant, and that estoppel, acquiescence, and laches prevent the Association from belatedly asserting its claim. After a period of discovery, the parties made cross-motions for summary judgment.

The district court noted that the parties "agreed that the passage of time has rendered further illumination of the facts (upon which their differences are principally semantic) both unlikely and unnecessary."[54] The court held that: (1) the 1939 resolution was. intended as a revocable license to use the NAACP initials; (2) the Association did not lose exclusive control of its initials by acquiescence, estoppel, or laches; and (3) the potential for future public confusion between these two parties as a result of the shared trademark was substantial. The district court thus granted the Association's motion for summary judgment. The court ordered that an injunction banning the LDF's use of the NAACP initials would issue upon exhaustion of appeals. It also prohibited the LDF from referring to their former affiliation with the Association two years following this initial injunction. But because we find that the Association's suit is barred by laches, the district court's judgment is reversed.[55]

## II. The Laches Defense

and Educational Fund, Inc. (June 25, 1979), Exh. 153 at 282; *see also* Exh. 4 *supra* note 7, at 18–19.

**48.** 559 F.Supp. at 1343; Appellant's Brief at 11. The language currently employed is:
The NAACP Legal Defense & Educational Fund is not part of the National Association for the Advancement of Colored People although it was founded by it and shares its commitment to equal rights. LDF has had for over 25 years a separate Board, program, staff, office and budget.
Appellant's Brief at 11.

**49.** *See, e.g., Bernard v. Gulf Oil Co.,* 619 F.2d 459, 470 (5th Cir.1980) (en banc), *aff'd,* 452 U.S. 89, 100 S.Ct. 2193, 68 L.Ed.2d 693 (1981); *Northcross v. Board of Educ.,* 611 F.2d 624, 637 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 3000, 64 L.Ed.2d 862 (1980). We were informed during oral argument that 1300 cases have been brought under the LDF's name, using the NAACP initials. The district court indicated

that "[t]he universal esteem in which the initials are held is due in significant measure to its distinguished record as a civil rights litigator." 559 F.Supp. at 1345.

**50.** Appellant's Brief at 12.

**51.** At least thirteen such organizations exist. *See* Appellant's Brief at 12.

**52.** 559 F.Supp. at 1341.

**53.** *Id.*

**54.** *Id.* at 1339.

**55.** In so doing, we need not decide whether summary judgment was appropriate in denying the defendant's other independent defenses. Nor do we reach the controversies involving the amount of public confusion and the validity of the district court's remedy.

The doctrine of laches [56] bars relief to those who delay the assertion of their claims for an unreasonable time. Laches is founded on the notion that equity aids the vigilant and not those who slumber on their rights. Several aims are served by requiring the reasonable diligence of plaintiffs in pursuing their legal rights. Plaintiffs are encouraged to file suits when courts are in the best position to resolve disputes. As claims become increasingly stale, pertinent evidence becomes lost; equitable boundaries blur as defendants invest capital and labor into their claimed property;[57] and plaintiffs gain the unfair advantage of hindsight, while defendants suffer the disadvantage of an uncertain future outcome.

Here almost thirteen years passed from 1966 through 1978 during which this case was ripe for judgment. Laches may not have been applicable if the Association had pursued negotiations during this time rather than going directly to court.[58] Understandably these two civil rights organizations were reluctant to air publicly a fight among brothers and sisters. But legal precedent requires that this well-meaning motive be objectively evidenced by ongoing negotiation to excuse a stale claim.[59] The Association fails to offer reasons why negotiations were not possible.

## A. *The Doctrine*

The essential elements of laches are well-defined by common law. There are three affirmative requirements: (1) a substantial delay by a plaintiff prior to filing suit; (2) a plaintiff's awareness that the disputed trademark was being infringed; and (3) a reliance interest resulting from the defendant's continued development of good-will during this period of delay.[60] Courts also look for factors that may negate the invocation of laches by excusing the delay: (1) ongoing negotiations;[61] and (2) conscious fraud or bad faith by the defendant.[62]

Laches may bar injunctive relief when the defendant has established a substantial reliance interest.[63] The district court failed to recognize this principle.[64] It

---

**56.** *See* Trademark Act of 1946 As Amended, 15 U.S.C. § 1069 (1982) (principles of laches may be applied by federal courts).

**57.** Non-profit organizations must heavily rely on their accumulated goodwill. This is due to "contract-failure": services provided by non-profits are often not immediately verifiable to their contributors. *See* Hansmann, *The Role of Non-profit Enterprise*, 89 YALE L.J. 835, 843–45 (1980). Here goodwill is tied to a trademark that defines property lines. Contributors identify particular non-profit organizations by the goodwill built around their trademarks.

**58.** The record, as described by the district court, plainly indicates the total lack of negotiations during this time frame. 559 F.Supp. at 1341. Nor does the Association challenge this factual finding.

**59.** In some instances, courts excuse delay if there were on-going negotiations. *See infra* p. 139. On the other hand, there are no court cases excusing twelve years of delay purely on the motive, however well-meaning, of wishing to avoid the disadvantages of filing suit. Laches is not like the defenses of acquiescence or abandonment that may require evidence of an intent to abandon. 4 R. CALLMAN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 22.21, at 110 (1983).

**60.** *See Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1040 (2d Cir.1980); R. CALLMAN, *supra* note 59.

**61.** *See infra* p. 139.

**62.** *See, e.g., Cuban Cigar Brands v. Upmann Int'l, Inc.*, 457 F.Supp. 1090, 1098–99 (S.D.N.Y.1978).

**63.** *See French Republic v. Saratoga Vichy Spring Co.*, 191 U.S. 427, 24 S.Ct. 145, 48 L.Ed. 247 (1903); *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1041 (2d Cir.1980).

**64.** The district court stated that laches rarely bars injunctive relief. 559 F.Supp. at 1344. But the very sources cited by the district court recognize the importance of a defendant's reliance interest. *See, e.g., Menendez v. Holt*, 128 U.S. 514, 524, 9 S.Ct. 143, 145, 32 L.Ed. 526 (1888) (no denial of injunction because no action done in reliance); R. CALLMAN, *supra* note 59 § 22.21, at 110 (mere delay without the defendant's reliance does not disentitle plaintiff to injunction). Furthermore, the Supreme Court, in later opinions, explicitly made laches available as an equitable defense barring injunctive relief. *See, e.g., French Republic v. Saratoga Vichy Spring Co.*, 191 U.S. 427, 24 S.Ct. 145, 48 L.Ed. 247 (1903).

is true that "mere delay" by itself does not bar injunctive relief if the defendant did not invest resources that contribute to a trademark's future value.[65] But injunctive relief may be appropriately barred when the defendant invested substantial labor and capital that builds the trademark's goodwill.[66] This future property interest, resulting from reliance during the plaintiff's negligent delay, therefore prevents the enjoining of the defendant's continued use of the trademark.

The district court erred in denying the defense of laches. Although considerable deference is given to the trial judge's discretion on the question of laches,[67] here the material facts are not in dispute according to both the parties and the district court.[68]

B. *The Affirmative Requirements*

The requirements of laches are satisfied by the facts of this case. First, the Association delayed for almost thirteen years before resuming negotiations over the LDF's use of the NAACP initials. This length of time is comparable to that in other cases in which the laches doctrine has been applied.[69] While mere delay by itself does not bar injunctive relief, here there was substantial investment by the LDF during this considerable time lapse. Because the Association did not give clear notice of its exclusive claim to the NAACP initials during this hiatus, the Association failed to reserve its rights. Such delay invites reasonable reliance by strengthening the defendant's belief that its use of a trademark will not be challenged. The cases cited by the district court do not tolerate the length of the delay found here.[70]

Second, it is undisputed that the Association had knowledge of the LDF's alleged infringement.[71] These two organizations knew each other intimately. In 1957, it was a mutual decision to separate and to allow the LDF to retain its NAACP initials. In the 1960's, the Association was also aware of the direct competition that was developing between the parties. The Association had ample opportunity to resort to a suit. In fact, the Association did threaten litigation, but withdrew its threat.[72]

Third, the Association's conduct gave the LDF reasonable justification to rely on the Association's inaction, and to invest resources based upon this reliance. We again emphasize that, while mere passage of time does not bar injunctive relief, here the defendant's use of the NAACP initials resulted from both the plaintiff's inaction *and* conduct that encouraged continued use of the trademark. The Association failed to reserve its rights during the twelve year period. Indeed, it had previously agreed to the LDF's independence without asserting an exclusive claim to the NAACP initials. The prejudice resulting from the reliance interest building during the years of delay

---

65. In such an instance, simply barring the plaintiff's monetary recovery of damages during the negligent delay may be considered.

66. *See infra* p. 139.

67. *See, e.g., Baker Mfg. Co. v. Whitewater Mfg. Co.,* 430 F.2d 1008, 1009 (7th Cir.1970), *cert. denied,* 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971) (while recognizing weight of district court's discretion, the appellate court reverses after review of detailed record).

68. *See supra* notes 2 & 3.

69. *See, e.g., Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961) (eleven-year delay); *Seven-Up Co. v. O-So-Grape,* 283 F.2d 103, 105–06 (7th Cir.1960), *cert. denied,* 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961) (thirteen-year delay).

70. *See, e.g., Independent Nail & Packing Co. v. Stronghold Screw Prods., Inc.,* 205 F.2d 921 (7th Cir.), *cert. denied,* 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391 (1953) (two-day delay); *Coca-Cola Co. v. Gemini Rising, Inc.,* 346 F.Supp. 1183, 1192 (E.D.N.Y.1972) (ten to fifteen months); *H.A. Friend and Co. v. Friend and Co.,* 276 F.Supp. 707, 716 (C.D.Cal.1967), *aff'd,* 416 F.2d 526 (9th Cir.1969), *cert. denied,* 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970) (one and a half years).

71. This is not a case where the plaintiff was ignorant of the alleged infringer's use of its trademark. *See Ancient Egyptian Arabic Order of Nobles of the Mystic Shrine v. Michaux,* 279 U.S. 737, 747, 49 S.Ct. 485, 488, 73 L.Ed. 931 (1929); R. CALLMAN, *supra* note 59, § 22.21, at 110.

72. *See supra* p. 135.

in this case was substantial. The LDF continued to develop "[t]he universal esteem in which the [NAACP] initials are held."[73] The LDF invested substantial labor and millions of dollars in pressing important civil rights suits, soliciting gifts, and recruiting legal talent using the NAACP initials.[74] Because many organizations have names virtually identical to the LDF's except for the NAACP initials, it is only these initials that distinguish the LDF from its emulators.[75]

Courts have never imposed an affirmative obligation upon a defendant to clarify its right to use a disputed trademark during the plaintiff's delay.[76] The undisputed facts of this case point to the reasonableness of the LDF's reliance upon the Association's delay in enforcing its claims. The passing of almost thirteen years without any clear reservation of rights by the Association creates a presumption of reasonable reliance. The Association's conduct included affirmative acts of encouragement. Besides having agreed to the LDF's independence, the Association continued as a client of the LDF and did not protest the LDF's use of the initials despite the LDF's independent dealings with other clients. Finally, the LDF was aware that the Association

had threatened to sue but did not.[77] The LDF's good-faith reliance was reasonably based upon both the Association's prolonged passivity and its affirmative acts.

C. *The Absence of Negating Factors*

The district court correctly indicated that courts tolerate delays if the parties are negotiating a settlement.[78] But the undisputed facts show that from 1966 through 1978 there were no negotiations. In the total absence of negotiations, delay "stemming from an abhorrence of time-consuming and costly litigation" does not preclude laches.[79]

Nor was there any evidence presented that suggested bad faith or conscious fraud by the LDF. Indeed, both parties have cooperated in exchanging donations attributed to the wrong organization. The LDF's disclaimer on its stationery further indicates good faith efforts to reduce any possible public confusion over its use of the NAACP initials. In conclusion, there is an absence of factors that might counsel our hesitation in applying laches.

### III. THE LACK OF LICENSING ARRANGEMENTS

The Association alleges that from 1966–78 the LDF possessed only a revocable

---

**73.** 559 F.Supp. at 1345. So during this time, the Association benefitted from the added luster given to the NAACP initials by the LDF's litigation successes.

**74.** *See supra* pp. 135–136.

**75.** Despite acknowledging this evidence, the district court concluded that there was "no evidence" to support a finding of prejudice. The court felt that the LDF could recast its identity *sans* the initials. 559 F.Supp. at 1344. But prejudice is not the mechanical ability to change identities, but the loss of the investment in labor and capital in reliance upon the plaintiff's inaction. Also there was substantial evidence on the record of the additional monetary costs of fundraising if the LDF was unable to use the NAACP initials. *See* James Robinson Affidavit (Apr. 13, 1983), ¶¶ 5–8.

**76.** The district court also concluded that because the LDF knew "that a reckoning could come at any time," it is forced to suffer the consequences of taking this risk. 559 F.Supp. at 1344. But the cases never have imputed this gambling as affecting the result. All the evi-

dence indicates that the LDF acted in good faith and believed that it had a justifiable right to use the NAACP initials.

**77.** *See supra* p. 135. For similar instances where laches is applied because a suit was threatened and followed by delay, see *Continental Coatings Corp. v. Metco, Inc.,* 464 F.2d 1375 (7th Cir.1972); *Anheuser-Busch, Inc. v. Du Bois Brewing Co.,* 175 F.2d 370 (3d Cir.1949). *See also* 4 R. CALLMAN, *supra* note 59, § 22.23, at 118; 2 H. NIMS, THE LAW OF UNFAIR COMPETITION AND TRADEMARKS § 409, at 1286–87 (1947). None of the cases or authorities distinguish whether the threat to sue is delivered through formal versus informal channels. The significant point is that a dropped threat of suit suggests that the defendant's reliance was reasonable. Communications between these two organizations largely relied on informal ties.

**78.** 559 F.Supp. at 1344.

**79.** R. CALLMAN, *supra* note 59, § 22.23 at 119; *see also supra* note 59. The Association did sue a Rhode Island organization that had used the NAACP initials. 559 F.Supp. at 1341 n. 1.

license to use the NAACP initials. The Association bases this view upon a non-profit parent organization's right to revoke use of its name when an affiliate dissociates itself from the parent.[80] Our review of the case law reveals no separate rule for non-profit organizations.[81] The cases relied upon by the Association involve local chapters of national organizations whose right to use the parent's name was conditioned—in the organization's bylaws or charter—on the local's continued affiliation with the national organization.[82] The agreements between the Association and the LDF contained no such condition.

Even examined in the most favorable light, these cases do not establish that an affiliate's right to use the parent's name ceases anytime the parent chooses. Rather, they establish that the affiliate's right expires *when the affiliation ceases*. The parent organization therefore must assert its exclusive claim to the trademark when disaffiliation occurs. Here the affiliation between the Association and the LDF ceased in 1957. Nevertheless, there was mutual agreement to the LDF's continued use of the NAACP initials as an independent organization.

■ A revocable license cannot be contrived from the record. Such trademark licensing requires (1) explicit contractual arrangements indicating revocability;[83] and (2) supervision and controls by the licensor over the licensee.[84] Indeed, there was no contract between the parties which contained the words "revocable license," much less any exchange of consideration for this alleged license. The record before us is clear that there was no mutual agreement to a revocable licensing arrangement.[85]

## IV. Conclusion

The National Association for the Advancement of Colored People and the NAACP Legal Defense and Education

---

**80.** Appllee's Brief at 48.

**81.** Given the heavy reliance by non-profits upon trademarks, *see supra* note 57, it would seem especially important that we encourage clear contractual arrangements regarding their use of trademarks.

**82.** *See, e.g., United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 139–40 (3d Cir.1981); *United States Jaycees v. San Francisco Jr. Chamber of Commerce*, 354 F.Supp. 61, 71 (N.D.Cal. 1972), *aff'd*, 513 F.2d 1226 (9th Cir.1975); *see also* 513 F.2d at 1231 & n. 9 (Merrill, J., dissenting) (discussing *National Bd. of the Young Women's Christian Ass'n v. Young Women's Christian Ass'n of Charleston*, 335 F.Supp. 615 (D.S.C.1971); *Grand Lodge Improved Benevolent, Protective Order of Elks of the World v. Eureka Lodge No. 5, Independent Elks*, 114 F.2d 46, 48 (4th Cir.), *cert. denied*, 311 U.S. 709, 61 S.Ct. 319, 85 L.Ed. 461 (1940)).

**83.** There were no provisions which indicated (1) that this alleged license was revocable at will, or (2) under what conditions the license would be revoked. We can find no cases in which a revocable trademark license was imputed when there was a twelve-year delay while the defendant was developing a significant reliance interest during this time. In fact, in the absence of qualifying language upon a license, the right to use the license may be deemed perpetual. *See Kidd v. Johnson*, 100 U.S. (10 Otto) 617, 619, 25 L.Ed. 769 (1879); *see also Croton Watch Co. v.*

*Laughlin*, 208 F.2d 93, 96 (2d Cir.1953); *Coca-Cola Bottling Co. v. Coca-Cola Co.*, 269 F. 796, 807–08, 811 (D.Del.1920).

**84.** Here there was neither *contractual* control nor *actual* control by the Association over the LDF's work with other clients from 1957–78. *See Reddy Communications, Inc. v. Environmental Action Foundation*, 477 F.Supp. 936, 944 (D.D.C.1979).

**85.** Nor did the 1939 resolution result in a revocable licensing arrangement. The Association's resolution did "grant permission for the use of the initials." *See supra* note 12. No mention was made of a revocable license; no words indicated the conditions that would cause revocation of the grant. To the contrary, the record shows that the Association did not intend to condition the grant in this manner. Zand Affidavit, *supra* note 11, ¶¶ 4, 5.

Although we need not decide whether the 1957 agreement constituted an irrevocable license, certainly the record does not support the finding that a revocable license was granted. The parties mutually agreed to the LDF's independence and continued use of the NAACP initials. The Association's right as a parent organization to deny an affiliate's use of its name was ripe for determination at that time. It does not seem reasonable to impute retroactively a revocable license during the twelve-year time span in which the LDF was expending resources in reliance upon the Association's inaction.

Fund, Inc. share common ideals and a distinguished common heritage. History suggests that they were jointly responsible for the revolution in civil rights that led to and has been epitomized by the Supreme Court's decision in *Brown v. Board of Education.*[86] The passage of time coupled with the reliance between the parties leads this court to conclude that laches bars the injunctive relief sought by the Association. These two great organizations, like brilliant but quarreling family members, must continue to share the NAACP initials with which they were born. The judgment is reversed. The case is remanded to the district court with directions that the suit be dismissed.

*So ordered.*

---

**86.**  347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).